THOMAS GREEN *v.* THE STATE.

| 12 | 51 |
| 33 | 280 |

1. EVIDENCE.— The proposition is elementary that evidence, to be admissible, must have a tendency to prove or to disprove the issue; and this rule excludes proof of collateral facts incapable of generating any reasonable presumption or inference respecting the main fact in issue.

2. CIRCUMSTANTIAL EVIDENCE.— When the evidence is purely circumstantial, however, the above rule is less stringent than when direct proofs are adduced.   Note the illustration in the present case.

3. BILLS OF EXCEPTION to the exclusion of evidence cannot be incorporated in the statement of facts, as may exceptions to the admission of evidence.

4. FACT CASE.— See circumstantial evidence *held* insufficient to sustain a conviction for theft.

APPEAL from the District Court of Limestone.   Tried below before the Hon. L. D. BRADLEY.

The indictment charged the appellant with theft of a saddle, bridle and halter, worth $26, the property of T. J. Fields.   By the verdict of conviction the punishment was assessed at a term of two years in the penitentiary.

T. J. Fields, for the State, testified that about the 1st of August, 1881, at night, he went to a church at Blooming Grove, in Navarro county, on horseback, and was riding a full-rigged, red leather, oil-tanned saddle, worth $22 or $23.   He hitched his horse to a fence, about two hun-

dred yards from the church. Defendant was at the church that night, and for a while was sitting in a wagon in front of the church, along with witness and others. Witness went down to his horse, and while there saw the defendant approaching. Defendant, as soon as he saw the witness, stopped, and witness went up to him, and they returned together to the church door, where witness stopped. The last he saw of the defendant that night, the latter left the church door and went out in front, in the direction of witness's horse. When witness started home, his horse and accoutrements were gone. Witness had tied him securely, and did not think he got loose. He recovered the horse the next day, but did not find his saddle until some three weeks afterwards, when he found it in the possession of a young man named Brown, in Limestone county, about two miles north of Groesbeck. It did not have the stirrups to it. Part of witness's bridle and halter were also in Brown's possession. The stirrups and the rest of the bridle, witness found at Simmons's livery stable in Mexia, and the rest of the halter in possession of another person near Mexia. The defendant knew or might have known witness's horse and saddle.

On cross-examination the witness said he had known the defendant seven years, and lived four or five miles from him. Witness saw other persons besides the defendant walking around among the horses near the church. So far as witness could say, the defendant knew no more about the horse and saddle than other young men in the neighborhood. There were other saddles of the same sort in the vicinity. Witness did not know whether the defendant had left the church when witness missed his horse and saddle. The fence was the only hitching place near the church, and there were many horses hitched to it and between witness's horse and the church. If defendant had a horse there, he must have hitched it beyond witness's from the church.

Statement of the case.

Willie Brown, for the State, testified that in August, 1881, the defendant came to the house of witness's father, two miles north of Groesbeck on the road to Mexia. He came about half past eleven in the forenoon and asked for dinner and to have his horse fed. His horse was fed, but he did not get dinner, there being sickness in the family. He said he was going to Hill county. He was riding a sorrel mare, and proposed to trade saddles with witness. They swapped saddles, and witness also traded part of his bridle and halter for part of defendant's. When the defendant left he inquired and witness told him the way to Mr. Winston's, and he started in that direction, which was also the direction of Mexia. The saddle witness got from the defendant was a full-rigged, red leather, oil-tanned saddle, worth twenty dollars, and the bridle and halter were worth two dollars. The saddle the defendant got from witness was worth fourteen or fifteen dollars.

On cross-examination the witness stated that defendant said he wanted to swap saddles because his mare's back was sore, and he wanted a lighter saddle. The mare's back was sore, and defendant's saddle was a heavier one than the saddle witness traded him. Mr. Winston lives in the neighborhood, and is a well-known man.

W. Jordan, for the State, testified that he lived about two miles south of Groesbeck. A short time before the defendant was arrested, he came by witness's house, and, as witness thought, stayed all night. He said he lived in Hill county, and was on his way to Austin to see his sister. To come by witness's house in traveling from Hill county to Austin would be a long distance out of the way. (To this evidence the defense objected on the ground of irrelevancy, but the objection was overruled, and the defense excepted.) Defendant said his saddle cost him twenty-five dollars. When he left witness's house he started towards Groesbeck, which was not the way to Austin. This was some time in August, 1881.

Tom Whatley, for the State, testified that he lived about a mile south of Groesbeck, and thought he had met the defendant, between home and Groesbeck, after the latter had left the public road and taken a wood-road. Witness told the defendant he could not get through that way, and defendant replied that he thought he would save distance by taking that route. To this evidence the defense objected that it was irrelevant and calculated to mislead the jury, and, the objections being overruled, the defense reserved exceptions.

J. W. Simmons, for the State, testified that he kept a livery stable in Mexia. Some time in August, 1881, the defendant came to the stable, riding a black, swaim-tree saddle, which had stirrups that did not correspond with the saddle. Defendant told witness he had traded saddles the preceding day. The stirrups had red leather housings. Afterwards a young man named A. J. Fields came with a saddle which corresponded with the stirrups on the swaim-tree saddle ridden by the defendant. The saddle ridden by Fields was a red leather, oil-tanned saddle, worth about twenty-five dollars. Fields also brought with him a part of a bridle which corresponded with portions of a bridle left at the stable by the defendant. The defendant said he had made a crop about twelve miles southwest of Mexia.

For the defense the first witness introduced was Jesse Green, a brother of the defendant, who stated that he remembered when Mr. Fields is said to have lost his saddle, and was at the church the night it was reported to have been lost. Dave Peveyhouse, Frank Simpson, the defendant and the witness went to the church together, on horseback. Before they started to church their horses were hitched to trees in the yard, and a little before sunset a man rode up to the gate on a sorrel mare and leading a gray horse. He inquired where he could get water for his animals, and was directed by the

defendant to an old well about three hundred yards distant. The man inquired if any of those present had any trading stock, and said his mare's back was sore and he wanted to trade her off; to which the defendant replied that he had a horse he would trade. The man said he would camp at the well, and told the defendant to bring his horse there the next morning. Witness and the defendant, with their companions, then went to the church. Mr. Fields was there, and witness saw him at one time in a wagon with others, and afterwards saw him at the door of the church. Defendant and his party remained until the services were over, and then returned home together. Before leaving the ground but after the services had closed, the witness heard some one say that Mr. Fields's horse had got loose, with the saddle on him. About sunrise the next morning the defendant took his bay horse, and, accompanied by witness and Frank Simpson, went down to the well and traded his horse to the man for the sorrel mare, the bridle, halter, blanket and saddle, giving thirty dollars in money to boot. The saddle was a full-rigged, red leather, oil-tanned saddle. The mare's back was a little sore. The man gave his name as Southerland; he was about five feet ten inches high, dark complexion, had a mustache, and, witness thought, a little chin whiskers. For some time previous the defendant had been talking about leaving home, and he had fixed to start on the day he traded with Southerland. Defendant sometimes sports, and was going off to see if he could find a game of cards. He had taken such trips once or twice before. After breakfast on the day he made the trade, he left on the mare and saddle he got from Southerland, and said he was going to Waco and probably to Mexia. On cross-examination the witness said he saw Southerland when he first rode up, had never seen him before, did not know where he lived, nor hear him say where he was going. Witness did not

know Mr. Fields's saddle, and thought his brother, the defendant, did not.

Frank Simpson, for the defense, testified that he knew Mr. Fields, and remembered the night, about August 1,. 1881, on which the latter's horse and saddle were said to have been taken from the church. In the evening of that day the witness, who lived near Blooming Grove, was at the house of the defendant's mother. About half an hour before sunset a man rode up to the gate and inquired for stock water. Some of the boys directed him to go to an old well two or three hundred yards off. Witness and the other young men were ready to go to church, and had their horses hitched to trees in the yard.. The man who came up to the gate was riding a sorrel mare and leading a gray horse. He said his mare's back was sore, and inquired if any of those present had a horse to trade. The defendant told him he had a horse he would trade, and the man told him to bring the horse down the next morning. Shortly afterward, the witness, with Dave Peveyhouse, Jesse Green and the defendant went to the church, hitched their horses to the fence, remained until the services were over, and then returned together to the house of defendant's mother, and witness stayed there all night. The next morning witness and the others went down to the well where the man was camped. The defendant took with him a bay horse-pony he had. The man was of a dark complexion, above medium height, had a black mustache, and said his name was Southerland. Defendant traded his bay pony to the man for the sorrel mare, the bridle, halter, blanket, and a red leather, oil-tanned, full-rigged saddle, paying the man thirty dollars in money to boot. After breakfast, the defendant left, riding the mare and saddle he had traded for; he said he was going to Waco, and probably to Mexia. Cross-examined, the witness stated that he was sitting on the porch at defendant's mother's when the man rode up

to the gate, which was twenty or thirty steps distant from the porch.   He could see the man plainly, but did not notice how many saddles he had.   The county attorney asked the witness if he and defendant's brother Jesse had not made up this story for the purpose of acquitting the defendant; to which the witness replied that they had done no such thing.

The defense proposed to prove that several neighbors of Frank Simpson and Jesse Green were present in court, and that two of them had been brought there by the prosecution,— the object being to show that the State had the means of assailing the reputation of Simpson and Jesse Green in the regular way.   The court, on objection of the State's counsel, excluded the proof, and the defense excepted, but reserved no separate bill of exceptions.   The defense also proposed, but was not allowed, to prove that the defendant was an expert at cards; and excepted in like manner.

C. B. Pearre, Esq., was introduced by the defense, and stated that he lived at Waco, and had heard the description given of the man Southerland by the witnesses Simpson and Jesse Green.   Witness had known a man named Southerland in McLennan county, who was above medium height, had a dark complexion, a black mustache, and some chin whiskers.   Southerland had left McLennan for Navarro county over a year before the trial.   On cross-examination the witness stated that he heard Simpson and Jesse Green state the name and description of the man Southerland, before he, the witness, made known that he knew such a man.   Southerland had a wife and children.

*Burrow & Frisbie*, for the appellant, filed an able and elaborate argument.

*H. Chilton*, Assistant Attorney General, for the State.

White, P. J.   The proposition is elementary that evidence, to be admissible, must be such as has a tendency to prove or disprove the issue joined; and this rule excludes all evidence of collateral facts or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute. 1 Greenl. Evid. §§ 50, 51; *Cesure v. State*, 1 Texas Ct. App. 19.   Still we are not prepared to say that the court erred in admitting the evidence of the witness Whatley as to the conduct and action of defendant in going an out-of-the-way, untraveled road instead of along the public highway.   The evidence in the case was entirely circumstantial as to the main fact at least, viz., the theft of the property, and in such cases the mind seeks, and is permitted to seek, light and knowledge from every source, however dim, calculated to throw light upon the transaction.   *Means v. State*, 10 Texas Ct. App. 16; *Noftsinger v. State*, 7 Texas Ct. App. 301.

No separate, independent bills of exception were reserved at the trial, but all the exceptions reserved to rulings in the admission or exclusion of evidence are attempted to be saved and noted in the statement of facts. Such practice is provided for as to *admitted* evidence, in the 56th rule for the government of the District Courts; which is, that " exceptions to evidence *admitted* over objections made to it on the trial may be embraced in the statement of facts in connection with the evidence objected to."   *Cooper v. State*, 7 Texas Ct. App. 194.   This rule does not embrace excluded evidence, or evidence not permitted to be introduced by the court; and in such case a separate bill of exceptions should show the proposed evidence so that this court can pass intelligently upon the ruling.

Without a more extended discussion of the points raised by defendants' counsel in their bills of exception, it may suffice to say that we find no material error com-

mitted in the rulings and charge of the court, sufficient to require a reversal of the case. When, however, the evidence as exhibited in the statement of facts before us is considered, we are not satisfied that it sufficiently attests the guilt of the defendant with that degree of certainty that would sustain the judgment as a safe precedent. We do not pretend to say that defendant is not guilty of the crime charged, but the theory of the defense and the evidence supporting it are both reasonable and probable, and if true certainly entitle defendant to a verdict of acquittal. Another trial, we believe, will doubtless render the matter more certain the one way or the other, and lead to a result much more satisfactory and more free of doubt.

Because of the insufficiency of the evidence the judgment is reversed and cause remanded.

*Reversed and remanded.*